## Murry Nelson & Co. v. Joseph Leiter.

1. ATTACHMENTS—*Conveyances to Hinder or Delay Creditors.*—It is not enough that the effect of a conveyance is to delay creditors; it must be executed with such an intent and purpose.

2. SAME—*Does Not Lie for Constructive Fraud.*—A writ of attachment can not be legally issued for a mere constructive fraud, as contradistinguished from fraud in fact; and though a transaction is such that a court of equity might regard it as constructively fraudulent, and subject to be set aside at the instance of creditors, yet unless there is a fraudulent purpose or design actuating the defendant, the case is not to be considered as coming within the statutes in regard to attachments.

3. FRAUD—*Omission to Make Customary Publication, Not Evidence.*—The fact that no mention is made of a conveyance in a newspaper especially devoted to the publication of real estate transfers is not competent evidence upon the issue of fraud in making such conveyance.

4. STATUTES—*Construction of Section 13 of the Act Entitled " Banks."*—Section 13 of the act entitled " Banks " (1 Starr & Curtis, 2d Ed., 517), relating to the limitation of loans, does not apply to a case where a director makes a conveyance of his real estate to a trustee for the purpose of securing his indebtedness to the bank for advances on bills of lading and warehouse receipts.

Attachment.—Appeal from the Superior Court of Cook County; the Hon. SAMUEL C. STOUGH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1900. Affirmed. Opinion filed January 29, 1901. Rehearing denied.

Bentley & Burling, Frank P. Blair, and Murry Nelson Jr., attorneys for appellant.

W. W. Gurley, attorney for appellee.

Mr. Presiding Justice Shepard delivered the opinion of the court.

This is an attachment suit by appellant, a corporation, against appellee. The affidavit for attachment states that appellee is indebted to appellant in the sum of $17,512.07, and the statutory ground for attachment, as stated therein, is that appellee "has within two years last past fraudulently conveyed or assigned his property, so as to hinder and delay his creditors." No issue in assumpsit arose upon the pleadings, the plea of the defendant (appellee) being confined to traversing the attachment affidavit. A verdict was returned finding the assumpsit issues for the plaintiff (appellant), and the attachment issues for the defendant, and judgment was rendered accordingly.

As stated in the brief in its behalf:

" Appellant now maintains, among other things, that the verdict was contrary to the evidence; that the judge erred in refusing proper evidence offered by the plaintiff; that he commented in the hearing of the jury upon the evidence and the character of the witnesses, so as to prejudice the jury against appellant; that the jury was not properly instructed by the court; and that the verdict should have been set aside and a new trial granted."

There was no conflict in the evidence on the attachment issue, and in reviewing the cause we are, therefore, not limited by rules applicable to the case of a verdict returned upon conflicting testimony.

On June 13, 1898, the appellee conveyed, then knowing himself to be insolvent, substantially all of his real estate in Chicago, of large value, to John P. Wilson, by quit-claim deed of that date, for the expressed consideration of " one dollar and other good and valuable considerations." No consideration was in fact paid for the conveyance, and nothing of value passed.

The real consideration was expressed in a declaration of trust executed by Wilson at the same time, wherein it was stated that said deed, though absolute on its face, was made for the purpose of securing the payment of all indebtedness due from the appellee to the Illinois Trust and Savings Bank.

It was not so stated in either the deed or the trust declaration, but it appears that the indebtedness of appellee to the bank at the time exceeded five and a half million dollars. The deed and trust declaration were duly delivered to the Illinois Trust and Savings Bank and the deed was recorded, but the declaration of trust was not recorded.

Subsequently, and on August 8, 1898, appellee executed to Wilson a trust deed to secure a note for $500,000, to the Illinois Trust and Savings Bank, conveying the same premises. Wilson was a lawyer, and in these transactions was the legal adviser of the appellee, and, as appellee testifies, he (appellee) acted entirely on Wilson's advice. Mr. Wilson, in his testimony, after relating the situation surrounding the impending collapse of the large deals in wheat in which appellee was the main figure, says of this particular transaction :

" The question was presented to me, what was the best way to preserve the interests of all concerned. * * * I made inquiry from Joseph Leiter as to what property, if any, he had. He had stated to me that it was not improbable that attachments would be sued out or judgments recovered in some way and that it might be important to take some steps. He said to me that he had these two pieces of real estate, one on Washington street and one on Adams street, both heavily incumbered, and he had the equity. I suggested that some disposition be made of them. He said to me he would prefer and wished to make an assignment for the benefit of his creditors, so that all would share alike in what there was. I stated to him that I thought that would be a great injury to the interest of the parties with whom he was doing business, and in the disposition of the wheat in this large volume, scattered in these various ways, that it was important that there should be some one who had the right and the power to dispose of that wheat and direct in relation to it, and that in my

opinion it would be very prejudicial to his creditors and the parties in interest if he made an assignment for the benefit of his creditors. That was immediately dropped upon my making that statement.

Q. State a little more particularly just wherein it would be disadvantageous? A. Well, I explained to him that in my judgment, when he asked me—a party having to act under the order of the court would not be in a position to handle these varied interests and to make the contracts and assume the obligations involved in disposing of this wheat and converting it into cash, and a very great sacrifice would result. There were only a few words. There were very few important things ahead, and the conversation didn't take more than five minutes, probably five or ten at the outside. I then suggested—I then made inquiries about his father's advances, and was informed that his father had made very large advances to him and he was indebted to his father in the millions. I suggested that he convey the property to his father in satisfaction for the indebtedness to his father to the extent of the value of the property, informing him, in my opinion, that he had a perfect lawful right to do so. They both declined. They said they didn't wish the deed made. I then stated that I would suggest that they convey the property to secure the indebtedness due to the Illinois Trust & Savings Bank, which, as they informed me, was the largest creditor, that is, the largest creditor outside of his father, and stated that his failure would not, in my opinion, secure an equal distribution of his property among his creditors, but would only result in whichever creditor might bring an attachment against him or sue him first, securing his property, to the exclusion of his other creditors, and it didn't seem to me that would be very satisfactory to him. Upon my representing that to him, he said, 'Very well,' if I would prepare the paper he would make it. I asked him for the description of the indebtedness due to the bank, so that I might insert it in the mortgage or trust deed. He stated that he was unable to furnish it to me, because the advances had been made on bills of lading and warehouse receipts from time to time in various ways and in various securities, and that he could not give me any description which would enable me to insert it in the papers as we were sitting. I said I thought it was important that it should be done at once, and if satisfactory to him I would prepare a deed to myself with the declaration of trust that I held it to secure

these debts, and if there was anything over, to himself. He said that was left to me, whatever form I thought was proper. I called for the blank and wrote the quit-claim deed.

I dictated the declaration of trust to my stenographer and signed it, and had my clerk prepare a copy of the deed, and directed the original deed to be sent at once for record. I think that is a statement, in substance, of what transpired."

We observe no other evidence in explanation of the appellee's intention in making the deed.

Does this evidence disclose an intent by appellee in making the deed to thereby fraudulently hinder and delay his creditors, within the meaning of the law? We think not.

Our Supreme Court has construed the attachment act as applying only in cases where the debtor has committed a fraud in fact, in doing the act found fault with, as contradistinguished from a legal or constructive fraud. They have, in decided cases, held that it is " not enough that the effect of the deed was to delay creditors, but it must have been executed with that purpose and intent," and that " granting writs of attachment in cases where only legal or constructive fraud is shown is outside of the general scheme and purpose of the attachment law." Weare Commission Co. v. Druley, 156 Ill. 25.

And, again, in the later case of Wadsworth v. Laurie, 164 Ill. 42, it is said:

" The writ may not issue for mere constructive fraud, as contradistinguished from fraud in fact. In other words, though the transaction be such that a court of equity might regard it as constructively fraudulent, and therefore subject to be set aside at the instance of creditors, yet unless there was a fraudulent purpose or design actuating the defendant, the case is not within the statute."

In our opinion, the evidence referred to, fully negatives the intention of any actual fraud by appellee in making the deed.

But, it is argued, the circumstances show that actual fraud was within the purpose of appellee. The contentions in this behalf are based upon (a) the form of the conveyance—a deed absolute on its face, without anything to

show it to be intended as security; (b) the failure of the deed to appear in a list of conveyances published in a Chicago newspaper, in which conveyances of real estate and other kindred matters are usually published, and (c) the want of legal consideration for the deed.

Although the fact that a deed is made when a mortgage is intended, and the deed is recorded, though the evidence of the intention that it shall stand as a mortgage is kept off the records, may show constructive fraud as against creditors, we know of no case which holds that such a transaction amounts to an intentional fraud on the part of the grantor. No case so holding is cited, and we feel safe in saying that no well considered one exists. All the evidence on the subject shows that no directions or requests were given by appellee or Mr. Wilson, or by anybody in behalf of either of them, about withholding publicity of the conveyance. It was offered to be shown that no mention was made in one of the newspapers especially devoted to the publication of real estate transfers, of the conveyance in question, and the refusal by the court to admit the evidence is said to be error. Whether such a conveyance appeared in lists published by private enterprise does not seem to us to have any bearing whatever upon the issue of fraud in the case, and we think the court properly excluded evidence of it. The want of legal consideration for the deed is urged, and, in support of the contention, it is said that the claim of the bank was " a loan prohibited by the statute; " and again it is said, " the law of this State made every loan of the bank to Leiter after October, 1897, absolutely void. It was as if no such loans had been made." In support of the propositions, the statute is referred to, as is also the case of Penn v. Bornman, 102 Ill. 523.

After stating the limitation upon the total liabilities to a bank by any one person, company or firm, at a sum not exceeding ten per cent of the bank's capital stock actually paid in, the statute proceeds to say :

" But the discount of bills of exchange drawn in good faith against actually existing values, and the discount of

commercial or business paper actually owned by the person negotiating the same, shall not be considered as borrowed money." Starr & Curtis' Stat., Chap. 16a, entitled " Banks," Sec. 13.

It appears from Mr. Wilson's testimony that the advances made to appellee by the bank were " on bills of lading and warehouse receipts from time to time, in various ways and in various securities." Our opinion is that the statute does not apply to the present case. Penn v. Bornman, *supra*, was where the private charter of the bank declared that no director of the bank should become indebted to the bank, either directly or indirectly, beyond a specified per centum of the capital stock of the bank held by him, and the point of the decision was that contracts made by a director of the bank in violation of the express charter provision were void.

But as we have seen, the exceptions of the statute before us to the limitation upon the amount of indebtedness to a bank by a borrower, are in this case, or may be, ample to make appellee a good faith legal debtor to the bank within the intent of the statute.

We see no reason to hold, for any purpose, in this connection, that the deed was without a good faith legal consideration.

It is urged by appellant that the trial judge erred in commenting upon the evidence and the character of witnesses, within the hearing of the jury. The contention is based upon the fact that the court, after having admitted in evidence a certain letter of Mr. Wilson, changed his ruling, and in expressing to counsel his intention to do so, used the following language: "I feel as though, perhaps, I have made a mistake in admitting that letter in evidence, Brother Gurley. It is likely Mr. Wilson's opinion is far above that of the jury or the court, but still it is his opinion; " and then said to the jury: "I think I made a mistake in permitting that to be read in evidence. You will therefore disregard it."

We should not be inclined to hold that there was any substantial error committed by the court in this respect,

even though the question were before us.    But the sufficient answer is that no exception was taken by appellant at the trial to the action of the court in such regard.    The authorities are too numerous to cite.

It may or may not have been error for the court to over-rule the objection to the admission of the letter in the first instance, but such error, if any, was corrected by the court, as above, and if counsel wished to take advantage in this court of the manner in which the correction was made, he should have taken an exception to the action at the time.

We think there was no error in the refusal by the court to give certain instructions asked by appellant.    The first one of them was clearly bad for singling out a series of facts from the whole evidence, and so calling the attention of the jury to them as being the controlling ones in the case.    To review the others upon which any argument is made, would require us to repeat much of what we have already said.    The criticisms of appellee's instructions appear to be based on technical grounds, which, in our opinion, are without sufficient merit to require discussion.

The modification by the court of one of appellant's instructions now complained of, was not given as one of the reasons in support of the motion for a new trial in the court below, and can not, therefore, be the basis of an assignment of error in this court.

The verdict of the jury was right, under the evidence, and the judgment is affirmed.